Dickson v. Shay.

---

Darius M. Dickson et ux., appellants,

*v.*

Allen R. Shay, receiver, respondent.

A wife, possessed of a separate estate, permitted her husband, while a debtor, to carry on business therein in her name. He collected the income of her separate estate and made expenditures thereon. In a creditor's suit to subject the wife's realty to the payment of her husband's debts, upon the ground that his earnings had been expended in its improvement, the existence of such expenditure must be shown. If the amount expended by the husband on the wife's property is not in excess of the amount of her separate income received by him, the presumption will be, that he applied her income, and not his earnings, to the improvement of her estate.

Dickson *v.* Shay.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following opinion :

A judgment was obtained against the defendant, Darius M. Dickson. An execution was issued, but the amount due was not made by virtue of the writ. Supplementary proceedings were taken by the plaintiff, under the statute, and a receiver was appointed. This suit is brought in the name of the receiver. The charge in the bill is, that the defendant has credits which he fraudulently conceals, and that he has interests in the real estate of his wife which should be made subject to this judgment.

It is admitted that Mr. Dickson was indebted to the judgment creditor in the amount of the judgment in the year 1880, and that at that time Dickson was insolvent. In that year Mrs. Dickson, one of the defendants, purchased a village lot, which she paid for, out of $1,200 of her own money and of $1,000 which she borrowed. On this lot she erected a large building and called it "The Dickson Building." I think that the whole premises were quite heavily encumbered by her. She afterwards purchased a dwelling and lot and made improvements thereon, and also encumbered it.

In the Fall of the year 1880, Mrs. Dickson, by her husband, rented a portion of the Dickson building to one Breninger, to be occupied by him as and for a saloon. Breninger occupied this portion of the building until the 1st of March, 1881, when, it is claimed by the defendants, that Mrs. Dickson purchased all of the fixtures and other articles used in the trade ; and that, from that time, she carried on the saloon business there, by her husband, he doing all of the work, attending to all of the accounts, and making all of the purchases and sales. She paid for the saloon fixtures and goods $350, and this money she borrowed of her brother.

It is admitted that Mrs. Dickson did not purchase this saloon interest of her tenant, Breninger, with the view of engaging in the management of it, with her own hands, but with the intent of establishing a business there for her husband, he not only to superintend it but also to do all of the work. But it is claimed

that he was to superintend and work as her agent.   Dickson at
once took charge of the saloon and managed it wholly as his own.
From the testimony, I cannot but conclude that from the very first
Mrs. Dickson had nothing whatever to do with the saloon or its
management.   Indeed, taking their own testimony, it is clear
that Mrs. Dickson knew absolutely nothing about the concern,
except what her husband saw fit to tell her from time to time;
and what he so communicated to her was not from any accounts
or statements, but from such recollection thereof as he retained.
And so this business was conducted for a little more than a month.

At the next session of the court of common pleas, Mr. Dick-
son made application to that court, in his own name, for a license
to sell ale and other similar beverages in said saloon.   The
license was granted, and he accepted it in his own name.   He
also took a license from the United States government in his own
name.   For six successive years he thus applied for and thus
accepted a license in his own name.   He had placed over the
door of the saloon these words for a sign, " Billiards & Pool, D.
M. Dickson."   During those six years he took entire charge of
the saloon and managed it entirely according to his own pleasure.
Mrs. Dickson called upon him at the saloon about once a month,
but there is no proof that her calls were of a business nature,
other than to ask him for small sums of money, or that they had
any reference to the affairs of the saloon.   When asked why she
did not take out license in her own name, she said it was too
humiliating to her to do so.

It being urged by the complainant that this saloon business
was in reality Mr. Dickson's and not Mrs. Dickson's, and that
considerable profits came from it, which were mingled with
moneys of Mrs. Dickson's, and either applied towards the
improvement of her real estate or to the discharge of encum-
brances upon it, so that, by virtue of equitable principles, the
judgment creditor may follow such profits and may have his
judgment declared a lien upon the land of Mrs. Dickson, to the
extent of such profits, until his judgment is satisfied, it becomes
important to inquire whether this was Mr. Dickson's business in
fact.   On this point, it seems to me that the judgment of the

Dickson *v.* Shay.

court must be with the complainant. It is true that our statute authorizes a married woman to carry on business in her own name; but how can a business be called hers, which, whether from a just womanly pride or otherwise, she refuses to have conducted in her own name. The business in question she knew nothing about, had no conception of, and never pretended to look into. From the beginning she trusted wholly to her husband. In this respect, I think the case is quite different from that of *Kutcher* v. *Williams, 13 Stew. Eq. 436; Tresch* v. *Wirt, 7 Stew. Eq. 124,* affirmed, on appeal, *9 Stew. Eq. 356.*

It may be, as was claimed upon the argument, that those cases carried the doctrine declared by the statute to the utmost extent, but, to my mind, they are not broad enough to include the case now under consideration, as is insisted upon by counsel for the defendants. If this case should be adjudged to be within this statute, it would then certainly be within the reach of any debtor to withstand the just claims of his creditors, and, at the same time, exert his abilities in amassing wealth, by the simple claim on the part of his wife that she established him in the business and that he is carrying it on for her. The facts seem to sustain this view, for, beside his absolute control of the saloon business, he conducted and controlled all the affairs of his wife which pertained to her real estate, such as erecting new buildings, making various repairs and other improvements, collecting rents, paying taxes and discharging other obligations of hers, altogether at his own will. The receipts of the saloon, as well as all other moneys received, as rents and from the sale of horses, were intermingled in his pocket or deposited in bank, and were disbursed indiscriminately by him, and that, too, without any accounting to her, except by simply stating the result at the end of each year, no account whatsoever of the receipts of either business being kept. And the only way that they have now of ascertaining the sum total of the receipts is by recalling, by the aid of their recollection, the rents which were paid, from time to time, and certain other items for articles sold, and by declaring that the gross receipts of the saloon were from $1,800 to

$2,100, and that the profits of it were about $800. As to the rents, and one or two other items, the statement may be sufficiently reliable to guide the court, but clearly, as to the others, and as to the receipts of the saloon, it is very unsatisfactory. Besides these transactions, Mr. Dickson bought and sold three or four horses, employing these same moneys for that purpose, and adding the profits of each transaction to the general fund. The part that Mrs. Dickson took in any of these transactions was so slight as to make it impossible for the court to say that it comes up to the dignity of any business, trade, calling or enterprise whatever.

In the next place, were there any profits resulting from the saloon enterprise which can satisfactorily be traced into the hands of Mrs. Dickson? For whatever the profits were, they may all have been exhausted by Mr. Dickson in providing for his own wants or fancies, or in providing for the comfort and welfare of his family. In this respect, as has been said, whatever may be the moral obligation resting upon a debtor, the law can neither compel a man to earn money, nor to save it when he has earned it, for the purpose of discharging his debts.

I conclude that the note which Mrs. Dickson gave to her brother, for $350, was paid by Mr. Dickson out of the receipts of the saloon. I also think it plain that the profits from the purchase and sale of horses come within the same principle. If, in these transactions, he used any of Mrs. Dickson's money, it is equally certain that he used moneys which came to him from the saloon. And, according to his testimony, the profits on said transactions in horses were devoted to the benefit of Mrs. Dickson's real estate. In one transaction he made $50, in another $110, in another $87, and in another (whether buying and selling horses or not I am not sure) $55, being in all $315. If the bill be not broad enough to reach the profits resulting from his dealings in horses, it can be amended to that end, since the proof, upon that branch of the case, has been as fully presented as though it were the only issue. To these should be added the proceeds of the Susan Swartz note for $180. This note Mr.

Dickson took from his son, to whom he sold one of the said horses for a large price, and, after suit was brought on the claim now in question, he transferred it to his wife, without any consideration, and the amount due thereon she has appropriated to her own use.

It seems to me, when it is considered that, from the very outset, Mrs. Dickson fully understood Mr. Dickson's financial embarrassment and absolute insolvency, and the manner in which all these business transactions were conducted, and the small amount of money which she herself had to invest, and her own heavy indebtedness, and the manner in which she allowed her husband to use and to mingle both the profits of the saloon and the rents of her real estate, the very least that the court can do is to charge her real estate with the items above enumerated, since it is conceded that all the profits over and above the living for the family, and also all other moneys, were applied in some way to the benefit of her real estate, excepting, perhaps, the $350 of the saloon money, which Mr. Dickson applied to the payment of the note which Mrs. Dickson gave her brother for the money he loaned her to pay for the saloon fixtures. Thus, it seems to me, that the two items so distinctly traced to Mrs. Dickson, as to warrant the court in charging her real estate therewith, are the $315 from the sale of horses, and the $180, the amount of the Swartz note.

But I think that the statement made out by Mr. and Mrs. Dickson, and which they rely upon as showing all the receipts and payments since the commencement of the business, shows very satisfactorily that a still larger amount of money must have been devoted to the benefit of her estate than $495. That statement shows an excess of expenditures on the behalf of Mrs. Dickson by her husband, to the amount of $740 above all his receipts from real estate or otherwise for her. This excess has not been traced to any other source than to the saloon.

My judgment, then, is, that Mr. Dickson, by making the saloon business his own, as I have found above, and by paying for the fixtures, as I have found that he did with the money which he

made in the saloon, acquired such title to those fixtures, and all personal property pertaining to the saloon business, as will enable his creditors to claim them in equity, as against his wife. The receiver will be directed to sell these saloon fixtures, and all other personal property of the defendant, Mr. Dickson. If these fixtures do not produce sufficient to satisfy the demands of the plaintiff in the action at law, and all the costs attending the appointment of the receiver, and the costs in this court of these proceedings, then Mrs. Dickson will be required to account to the receiver for the $740, and that amount will be declared to be a lien upon her real estate, to an amount sufficient to satisfy the various sums due as aforesaid to the said plaintiff, and to the receiver; and if the same be not paid by her to the said receiver within thirty days from the date of the service of a copy of the decree, which shall be made herein upon her solicitor, then an execution may be issued according to the practice of this court.

The claim of the complainant's counsel that, under the directions of the statute (*Rev. 394 § 26*), it is the duty of the receiver to collect all of the property and things in action belonging to, or held in trust for, the debtor, however many or great they may be in excess of the amount due to the creditor, and to bring such excess into court, I think, cannot be sustained. I can conceive no reasonable ground for any such extra labor and expense. It seems to me that the statute which directs the receiver to apply the same in payment of said judgment, and the costs of the proceedings thereon, and the reasonable compensation of said receiver, to be taxed by the judge, and to pay the rest into said court wherein said judgment was recovered, to be there disposed of according to law, only means the excess (after such payments are made) which may result from one or more collections or suits by the receiver. In other words, I do not think it is proper for the receiver to interfere to an unreasonable extent, or to collect an unreasonable amount, any more than it would be for the sheriff to do so. The statute simply requires the receiver to bring into court whatever excess he may happen to have after such reasonable effort, just as the sheriff is required to do·by the statute and by writs directed to him.

The claim of Mrs. Dickson for rent for the saloon, in case I should take the view above expressed, cannot be sustained. If there was any possible understanding between her and her husband, express or implied, it was not that he should ever be required to pay rent, but that he should not. Her letting to him was in every sense a voluntary courtesy. But if it should appear that Mr. Dickson is under any legal liability to his wife, she has no such lien or claim therefor as will give it priority over the rights of this judgment creditor to the extent of the $740, which is declared to be a lien against her real estate.

I will advise a decree in accordance with these views.

*Messrs. Martin & Conklin*, for the appellants.

*Mr. F. J. Swayze* and *Mr. L. Van Blarcom*, for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The pleadings, in this case, present the issue of a judgment creditor seeking to reach property which his debtor has placed beyond the reach of legal process.

The defendants are husband and wife. The fraud alleged is, that the wife permitted the husband, while a debtor, to carry on business in her name in a place of business owned by her. The gravamen is, that the profits of the business thus conducted have gone into the improvement of the wife's real estate.

The court of chancery resolved the question of fraud against the defendants, and, by stating an account between the husband's business and the wife's property, reached the conclusion that several hundreds of dollars of his earnings had gone into her realty. For the amount thus ascertained, the complainant was given a lien upon the wife's real estate.

The material for such an account was furnished by the defendants, but the method of stating it, adopted by the court, was the

suggestion of the complainant.   As stated, the account stands
thus :

| | | |
|---|---|---|
| Total expenditures of defendants | $6,159 | 11 |
| Total receipts from wife's separate estate | 5,511 | 00 |
| Balance of expenditures over income | $648 | 11 |

which balance (so the argument was), must have come from the
earnings of the husband, and have gone into the wife's real estate,
together with some smaller items.

The account further discloses that of the total amount ex-
pended, to wit, $6,159.11, the sum of $4,687.20 was expended
upon the wife's estate, while the sum of $1,471.91 was for mis-
cellaneous disbursements not connected therewith.

The fallacy of the method of accounting adopted is, that it arbi-
trarily applies the income of the wife's separate property to the
liquidation of the husband's miscellaneous disbursements, before
applying any of it to the improvement of her separate estate.

The entire fund was in the husband's hands, the amount of
whose earnings is unknown, but it is known that, with his
wife's income, it was sufficient to pay both the miscellaneous
disbursements and the expenditure upon her realty.   The pre-
sumption of fact is, that he applied his own earnings, and not
his wife's income, to those miscellaneous matters for which he
was responsible and she was not.   There is no rule of law or
equity by which a wife's separate property will be arbitrarily
applied to the payment either of current living expenses or of
her husband's debts.

Bearing in mind this presumption, and rendering unto the wife
the things which are hers, the account states itself thus :

| | | |
|---|---|---|
| Amount of wife's income | $5,511 | 00 |
| Amount expended on her real estate | 4,687 | 20 |
| Excess of income | $823 | 80 |

which, deducted from $1,471.91, gives $648.11 as the amount of
the husband's presumptive earnings which have gone into his
miscellaneous disbursements.   If we deduct from both sides of

this account all items connected with the transactions in horses, it will not materially change the result. So far, then, from its being shown that any of the husband's earnings went into his wife's real estate, it appears certain that some hundreds of dollars of her income went with his earnings into the common fund for miscellaneous expenses.

The result thus reached, and the balance shown in favor of the wife's property, must control the question of the fixtures and other smaller items not directly connected with the husband's business, and in regard to which no fraudulent disposition was shown.

The decree should be reversed, and the bill of complaint dismissed.

*Decree unanimously reversed.*